IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ROSA BAEZ-VIERA, *et al.*,

       Plaintiffs,

       v.

COOPERATIVA ABRAHAM ROSA, *et al.*,

       Defendants.

Civil No. 08-2045 (JAG/BJM)

**REPORT AND RECOMMENDATION**

       Plaintiff Rosa Baez-Viera ("Baez" or "plaintiff"), her spouse Arnaldo Ortiz-Vazquez ("Ortiz"), and their conjugal partnership (collectively, "plaintiffs") bring this action against Cooperativa Abraham Rosa ("Cooperativa" or "defendant"), Luis López-Roman ("López"), his spouse Jane Doe, and their conjugal partnership (collectively, "the López defendants") for damages and other relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*, and related claims under Puerto Rico law. (Docket No. 1). Defendant Cooperativa filed a motion for summary judgment and supporting statement of uncontested material facts. (Docket Nos. 35, 35-28). Plaintiff filed original and supplemental motions in opposition and statements of uncontested material facts. (Docket Nos. 58, 58-2, 66, 67). Defendant replied, and plaintiff filed a sur-reply and an amended opposing statement of uncontested material facts. (Docket Nos. 69, 83, 84). The presiding district judge referred the matter to me for a report and recommendation. (Docket Nos. 89, 90). For the reasons that follow, I recommend that defendant's motion for summary judgment be **granted in part and denied in part**.

**I. FACTUAL BACKGROUND**

       The following material facts, which will be viewed in the light most favorable to plaintiffs as

the nonmoving party, are either undisputed or conclusively supported by the evidentiary record except where otherwise noted.[1]

### A.      Baez's Employment at Cooperativa

Defendant Cooperativa is a savings and credit cooperative organized under the laws of Puerto Rico, with its principal place of business in Toa Baja.  It has approximately 37 employees.  (Docket Nos. 1, ¶ 2; 10, ¶ 2; 35-28, ¶ 70).  Cooperativa is located in a two-story building, with the tellers' area on the first floor adjacent to the lobby, which leads to the building's rear parking lot.  (Docket No. 35-28, ¶ 71).  Plaintiff Baez was born on November 10, 1965.  (Docket No. 35-28, ¶ 2).  She worked as a teller at Cooperativa from May 9, 1997 until her termination on June 8, 2007, when she was 41 years old.  (Docket Nos. 35-28, ¶ 1; 58-2, ¶¶ 1, 2, 4).

Since 2001, the tellers' supervisor has been Lizette Colón, who in turn was supervised by Sol Matías Cortés ("Matías"), Cooperativa's Vice-President of Operations and Administration.  In addition to supervising Colón, Matías performs human resources tasks at Cooperativa, supervises the teller area in general, and also indirectly supervised Baez.  (Docket Nos. 35-28, ¶ 8; 58-2, ¶¶ 123-26).  Colón is 41 years old and was hired by Cooperativa around 1999.  (Docket Nos. 35-28, ¶ 29; 58-2, ¶ 79).  Throughout Baez's ten-year term of employment, López served as Cooperativa's Executive

---

[1] In determining what facts are supported by the evidentiary record, I have applied Local Rule 56(e):

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations required by this rule, shall be deemed admitted unless properly controverted.  An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.  The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.  The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Where unauthenticated documentary evidence offered in support of a statement of fact has not been challenged by the opposing party (or in fact has also been cited to by the opposing party), I have considered such evidence.  See 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, FEDERAL PRACTICE AND PROCEDURE § 2722, at 384 (1998) ("As is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged.").

President and oversaw all its operations.  López is 51 years old and has worked at Cooperativa since 1977.  (Docket Nos. 58-2, ¶ 3; 35-28, ¶ 69).  Matías assists López in the process of recruiting employees for the departments she supervises.  López decides whom to recruit, taking into consideration Matías's and others' recommendations.  (Docket No. 58-2, ¶¶ 133-34, 154, 156).

**B.     Cooperativa's Employee Manual**

In 1999, Baez received a copy of Cooperativa's "Employee's Informative Manual" ("Manual"), and she received a revised edition of the Manual in 2005.  She was given an orientation on the Manual and affirmed that she read and understood its contents.  (Id., ¶¶ 3, 4).  Some of the employee rules of conduct established in the Manual are marked as rules for which violation could entail immediate dismissal.  One such rule is "Failure to comply with the procedures of inactive accounts and the protection and management of transactions and custody of cash and values and norms of institutional security."  (Id., ¶ 7).

The Manual contains a written non-discrimination policy, regarding which outside counsel held a seminar at Cooperativa in 2005.  The policy includes a section on hostile work environment. In addition, there is an informative poster about workplace discrimination laws posted next to the employees' time clock at Cooperativa, which employees see every day.  (Docket Nos. 35-28, ¶¶ 60, 72-74; 58-2, ¶ 168).  The Manual contains a sexual harassment grievance procedure, which provides that if the harasser is Cooperativa's Executive President, the employee is to notify the head of Cooperativa's Board of Directors.  Where the Executive President discriminates against an employee based on a protected category such as age or sex, the proper proceeding, which is not listed in the Manual but which Colón testified has been communicated to the employees on several occasions, is to immediately inform the employee's supervisor or the Vice-President of Operations (*i.e.*, Matías). Alternatively, the employee may notify the head of Cooperativa's Executive Board of Directors. (Docket No. 35-28, ¶¶ 37, 75; 58-2, ¶¶ 169-70; 69-2, ¶¶ 169-70; 76-13, p. 4-10).  According to teller Jamillette Delgado Martínez ("Delgado"), tellers did not have the contact information for members of Cooperativa's Board of Directors.  Such information is available in Cooperativa's administrative

offices, which are protected by a security code so only authorized employees have access.  (Docket No. 58-2, ¶ 173).  The Manual does not contain a grievance procedure for reporting or notifying retaliation in the workplace.  (Docket No. 58-2, ¶ 171).  Baez stated in an affidavit that she was not aware of any procedure to follow if López, the Executive President, were to retaliate against her for reporting him to the Board of Directors.  (Docket No. 58-2, ¶ 172).

### C.      Baez's First Pregnancy

Between January 2006 (at age 40) and May 2007 (at age 41), Baez became pregnant twice, but lost the baby both times, less than a year apart.  (Docket No. 58-2, ¶¶ 8-9).  On May 17, 2006, Baez, then six months pregnant, became ill at work and told Delgado that she was feeling sick.  Baez also told Colón she was feeling "agitated" and scared.  Colón testified that she told Baez to leave work if she felt bad, but Baez testified that she was not permitted to leave until other tellers had come back from their lunch breaks.  Baez left work around midday,[2] and her husband Ortiz took her to her doctor.  Colón did not inform López or Matías that Baez was going to leave.  (Docket Nos. 35-28, ¶¶ 18, 21, 22, 30, 32, 55, 63; 58-2, ¶ 16; 76-16, p. 17).  The baby was born prematurely on that day and died three or four days after birth.  Baez took maternity leave from May 18 to July 13, 2006.  (Docket No. 35-28, ¶ 23; 58-2, ¶¶ 15, 19).

### D.      Baez's Job Performance Problems in 2007

Cooperativa prepares a monthly record of all of each teller's transactions, showing, among other things, negative and positive discrepancies in the teller's register.  On January 4, 2007, Colón's audit of Baez's cash register for the previous day showed a "negative discrepancy" of $604.84, which proved to be due to Baez's registering a check in the wrong amount and giving a customer $604.84 in excess.  Upon learning of the discrepancy, Matías met with Baez to discuss the seriousness of the

---

[2] In contradiction to the testimony of multiple witnesses that she left sometime during the noon hour, Baez's timecard reflects a clock-out time of 10:45 a.m., and she herself testified that she left Cooperativa around 2 p.m.  (Docket No. 46-17; 76-16, p. 17).  However, what time she left work is not a material fact, so it will not preclude summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).

incident, the latest in a string of such errors by Baez since 2000. Although Baez was given an opportunity to improve despite her many previous admonishments for various breaches, the discrepancies in her register continued, reaching approximately $700 by May 2007. (Docket No. 35-28, ¶¶ 11-14).

Cooperativa did not provide Baez with any additional job training in 2007 after her errors. Matías testified that Baez had already been trained, had vast experience as a teller, and knew all of Cooperativa's procedures. Matías believes Baez to have been one of Cooperativa's most experienced tellers. In Delgado's opinion, Baez's work was good, she had a lot of experience, and she knew Cooperativa's procedures, which she would help teach Delgado when Delgado had a question. (Docket No. 58-2, ¶¶ 138-40).

**E.     Baez's Second Pregnancy**

In or around February 2007, Baez learned she was pregnant again and told her coworkers at Cooperativa. (Docket No. 58-2, ¶ 20). She miscarried the pregnancy in May 2007. (Docket No. 58-2, ¶ 8). While plaintiffs allege that the miscarriage occurred on Sunday, May 13, 2007 (Docket No. 58-2, ¶ 21), there is conflicting testimony about the exact date and about who informed Cooperativa about the incident. Baez's husband Ortiz testified that on the day of the miscarriage, Baez called him from her job; he took her to a clinic, then called Cooperativa and informed Colón of the miscarriage. (Docket No. 35-28, ¶¶ 18, 24). However, Baez's obstetrician, Dr. Carlos Fonseca Salgado ("Dr. Salgado"), testified that he treated Baez at Pavia Hospital on that day, and that the clinic where he had been seeing Baez is not open on holidays. (Docket Nos. 35-28, ¶ 25; 76-7, p. 1-4). According to Baez, she was at home that Sunday when she started bleeding, so she went to her doctor's office. Upon finding it closed, she called Dr. Salgado, who met her at Pavia's emergency room ("ER"). At the ER, Dr. Salgado examined Baez and could not find a fetal heartbeat.

Baez testified that she went home that night, but that the next morning, Monday, May 14, she went to the clinic, from which she was sent to Pavia's ER. There, she learned she had miscarried the pregnancy and underwent a dilation and curettage ("D & C") procedure. Baez testified that she called

Cooperativa before entering the ER.   (Docket No. 35-28, ¶¶ 82-84; 58-2, ¶¶ 21-22; 76-7, p. 5).
According to an affidavit by Baez, she informed Cooperativa she would miss work that day due to
the D & C and later called back to give Colón an update, since Cooperativa requires employees to
contact their direct supervisor to inform them when they will be absent.  However, according to Baez,
she was informed that she had to speak to Matías instead.  When the call was transferred to Matías,
Matías, according to Baez, aggressively asked Baez when she would be returning to work and
suggested she get a doctor's clearance to return to work.  (Docket No. 58-2, ¶¶ 22-24).

The next day, Tuesday, May 15, 2007, Baez visited her doctor's office to get cleared for work.
(Docket No. 58-2, ¶ 26).  Baez authorized Dr. Salgado to issue a pre-signed "Disability Certificate,"
which he authorized his secretary to fill out.  Dr. Salgado testified, based on the certificate, that Baez
was cleared to return to work on May 15, 2007.  (Docket Nos. 35-28, ¶¶ 26, 27, 86; 58-2, ¶¶ 34-37).
Baez returned to work on May 16, 2007, after two days of maternity leave, still bleeding heavily from
the D & C procedure.  (Docket No. 58-2, ¶¶ 27-28). Cooperativa received the Disability Certificate
that day, but because the end date for Baez's incapacity had been left blank on the certificate, Matías
spoke with Dr. Salgado's secretary and had his office fax Cooperativa an amended certificate that
reflected an end date of May 15, 2007.  Matías testified that the blank date needed to be filled out in
order to pay Baez two days' maternity leave.  (Docket No. 58-2, ¶¶ 31-32).  The parties dispute
whether Baez authorized the amendment to the certificate.  (Docket Nos. 58-2, ¶ 32; 69-2, ¶ 32).  Dr.
Salgado was not involved in the issuance of the amended certificate and testified that he did not
remember authorizing his secretary to fill in the end date.  (Docket No. 58-2, ¶ 35).

Baez attests she returned to work so promptly because she feared she would be fired if she did
not.  (Docket No. 58-2, ¶ 29).  Colón testified that Baez told her she returned to work so quickly after
the miscarriage because she had had many absences in the preceding months and did not want to
continue missing work.  (Docket No. 35-28, ¶ 33).  According to Sherley Pagán Díaz ("Pagán"), a
teller at Cooperativa since 1999, López was annoyed by Baez's absences and Cooperativa did not like
for employees to be absent frequently from work.  (Docket No. 35-28, ¶¶ 45, 49).  According to

Delgado, female employees at Cooperativa thought it was bad to become pregnant while working there because Cooperativa frowned on the resulting absences and consequent costs to Cooperativa. (Docket No. 58-2, ¶ 13).

On her return to work, Baez's coworkers, including Matías, asked about her health and many asked whether she intended to try to become pregnant again.  She expressed, as she had after losing the previous pregnancy, that she would try to get pregnant again.  According to Pagán, Baez's intent was common knowledge at Cooperativa, but López denies knowing about it.  (Docket No. 58-2, ¶¶ 38-39, 43; 69-2, ¶¶ 38-39, 43).  During the period between January 1, 2006 and June 8, 2007, Baez was the only teller to become pregnant and/or suffer a miscarriage.  (Docket No. 58-2, ¶ 42).  Baez took two weeks of previously-scheduled vacation time from May 21 to June 4, 2007.  She returned to work the week of June 4 through 8, 2007.  (Docket No. 58-2, ¶¶ 44, 46).

**F.      Baez's 2007 Performance Evaluation**

The job performance of Cooperativa's tellers is evaluated annually on the anniversary of the date the teller started work.  (Docket No. 58-2, ¶ 65).  Cooperativa's Manual provides the procedure for employee evaluations.  The tellers' supervisor, in this case Colón, begins the process by preparing an initial draft of the evaluation, using a standard form.  The supervisor then discusses the draft with Matías, who makes observations and suggestions but does not herself write in any suggestions or make changes to the draft.  The supervisor then prepares the final version of the evaluation and submits it to the Executive President, in this case López.  The Executive President reviews the evaluation, determines if there are any discrepancies between his and the supervisor's opinion of the employee, and includes comments on the evaluation for purposes of discussion with the employee's supervisor.  According to Matías, the employee's direct supervisor discusses the evaluation with the employee only after López contributes any comments he has to make.  López does not attend the meeting between Colón and Matías, nor is Matías present at Colón's meeting with López.  (Docket Nos. 35-28, ¶¶ 9, 10, 34; 58-2, ¶¶ 64, 66-70, 72-73, 80).

Colón provided Baez with a copy of her annual evaluation for 2007 sometime between May

16 and June 7, 2007.  The evaluation gave Baez an overall score of "poor," which Baez had never before received and which Colón had never before given a teller.  Baez was graded as "average" in the areas of "knowledge, skill, and ability," "performance and productivity," and "quality," but "poor" in "compliance" and "responsibility," two areas in which she had been graded "good" in her last three evaluations.  According to López, the evaluation's section on "compliance," along with memoranda in Baez's employee file about her failure to follow procedures, reflected Cooperativa's progressive need to correct for account imbalances caused by Baez's errors.  Baez signed the evaluation and did not express her internal disagreement with its contents, as she feared reprisal from Cooperativa's administration if she did not sign it.  Baez had not expressed disagreement with previous years' evaluations, although her 2004, 2005, and 2006 evaluations had noted her need to improve her performance, productivity, and/or attendance.  Aside from a "poor" score in the area of "attendance and punctuality" in 2006, Baez's previous three evaluations gave her area scores that were mostly "good" or "excellent" in 2004 and 2005 and "average" or "good" in 2006, amounting to overall scores of "average" or "good."  Baez had received salary increases in 2000, 2002, 2003, 2004, and 2005. (Docket Nos. 35-28, ¶¶ 80, 81, 88; 58-2, ¶¶ 47, 49, 59, 60, 62, 81, 136, 141; 69-2, ¶¶ 49, 136; 76-10; 76-11; 76-12).

According to Baez, Colón was "forced" by Cooperativa's administration to modify the evaluation to reflect a "poor" score.  (Docket No. 58-2, ¶ 47).  Colón testified that when she met with Matías about Baez's evaluation, Matías made notes on Colón's draft and said that due to the losses Baez had caused through her register discrepancies, the "average" rating Colón had initially given Baez was wrong.  Colón testified that Matías suggested changes in the areas of "compliance" and "responsibility," in which Colón had rated Baez as "average."  Further, Colón testified, Matías modified the evaluation's comments for those areas.  Matías asked Colón to incorporate the suggested changes, which Colón did, resulting in a final overall rating of "poor" rather than the "average" overall score Colón testified Baez would have received absent the changes.  Cooperativa's management had never previously changed one of Baez's evaluations to reflect a "poor" score.  Colón

testified that she believed that she could have been terminated if she had not made the changes to the evaluation.  According to Baez, Colón told Baez she kept the first draft of her evaluation, which she took home with her.  Defendants planned to subpoena the draft evaluation from Colón.  (Docket Nos. 58-2, ¶¶ 48, 82-89; 69-2, ¶ 48; 75-3, p. 13; 76-15, p. 6-11).

While López reviewed and signed Colón's final version of Baez's evaluation, Colón testified that López did not participate in making any changes to her initial draft.  López, too, testified that he did not prepare any of the comments in Baez's evaluation or modify it in any way, but that he read the evaluation and agreed with it.  According to López, it was his understanding that Colón prepared the evaluation in its totality and that Matías did not prepare it.  (Docket Nos. 35-28, ¶¶ 42, 76, 79; 58-2, ¶¶ 63, 74-77).

**G.   Baez's Termination**

Baez was terminated on Friday, June 8, 2007, by way of a letter dated that same day and signed by López.  Matías and Cooperativa's attorney met with Baez at the end of the business day, handed her the letter, and requested that she read it and ask any questions she had about it, without stating the reasons for the termination.  Matías and López testified that Baez's evaluation provided the basis for Baez's termination.  (Docket No. 58-2, ¶¶ 4, 50, 52, 78).  Colón testified that she did not prepare Baez's evaluation with the intention of terminating her and was not the one who decided to terminate her.  (Docket No. 58-2, ¶ 88).  According to the letter, Baez was terminated as a result of the evaluation, which, the termination letter noted, classified her as "poor" in execution and performance, meaning she "did not fulfill the institutional expectations nor the requirements of the position."  The letter does not mention any layoffs or restructuring efforts at Cooperativa.  (Docket Nos. 58-2, ¶ 52; 80-2, p. 1).  Pagán testified that before her dismissal, Baez had cleaned out her desk drawer and taken out her belongings in anticipation of being fired.  (Docket No. 35-28, ¶ 50).

During the meeting where they gave Baez the termination letter, Matías and Cooperativa's attorney gave Baez an "Agreement and General Release" ("Release") signed by Matías, offering Baez nearly $11,000 as a "voluntary economic contribution" by Cooperativa to assist Baez in her

transitional period between jobs.  The release stated that Baez's acceptance was voluntary and included a legal disclaimer by Cooperativa of any responsibility, fault, negligence, or legal violation. The Release prescribed periods for Baez to consult an attorney and to revoke her agreement to the Release.  Baez did not accept the Release.  (Docket Nos. 58-2, ¶ 51; 69-2, ¶ 51; 76-14).

Matías testified that Cooperativa terminated Baez because, starting in the year 2000, the incidence of Baez's procedural mistakes and her register's coming up short increased.  Matías noted in particular that Baez's errors increased "drastically" in 2007, amounting to $700 by May.  (Docket Nos. 58-2, ¶ 90; 75-2, p. 2).  Matías testified that she met with Baez once or twice in early 2007 about Baez's errors and let Baez know that Cooperativa was giving her an opportunity to improve despite her multiple errors and warnings.  (Docket No. 58-2, ¶ 91).  Colón testified that Cooperativa gave Baez written warnings on January 10 and February 1, 2007, but Baez was not suspended or terminated at those times.  Colón cannot remember giving any warnings to Baez other than those two.  (Docket No. 58-2, ¶ 100).  López never provided Baez any kind of letter stating that Baez could or would be terminated if her performance did not improve.  (Docket No. 58-2, ¶ 92).

Due to the nature of their work and the volume of the transactions they conduct, tellers at Cooperativa sometimes make mistakes that result in their registers' reflecting discrepancies, such as coming up short at the end of a shift.  (Docket No. 58-2, ¶ 93).  According to Colón, there have been instances when Cooperativa tellers have been terminated after a written admonishment due to discrepancies in their registers.  (Docket No. 35-28, ¶ 41).  Colón prepares a monthly report of the tellers' transaction statistics that lists each teller's errors and the sum of all discrepancies.  (Docket No. 58-2, ¶ 95).  Pagán, who is 36 years old, testified that in April 2007, her register came up short by nearly $500, but she was not fired or suspended, nor did she receive a "poor" annual evaluation. (Docket No. 58-2, ¶ 98).  According to teller Maritza Ramos, who started working at Cooperativa around 2003, discrepancies in tellers' registers are a common occurrence.  Ramos stated that she had a register shortage of $450 in September 2005 and that another error by her in September 2007 caused a loss to Cooperativa of $2,000.  Ramos stated that she received memos from Cooperativa about both

incidents.[3]  She is still employed by Cooperativa.  (Docket No. 58-2, ¶¶ 93, 96-97).

Around May 2007, Colón had requested an additional part-time employee and another employee to replace a teller who had decided to leave Cooperativa.  While Baez was on vacation, Matías had an ad for a teller placed in the newspaper.  (Docket Nos. 35-28, ¶ 35; 58-2, ¶ 45).  Evenid Aponte Maisonet ("Aponte") responded to the ad, and Cooperativa hired her as a new teller and started her on the job on Tuesday, June 12, 2007, five days after Baez's termination.  Cooperativa had decided to hire Aponte prior to June 11, 2007.  On the day she was hired, Aponte was 30 years old and was not pregnant.  On October 22, 2007, Cooperativa hired Fatima Ramos Santiago ("Santiago") as a teller.  Santiago was 24 years old and was not pregnant when hired.  (Docket No. 58-2, ¶¶ 143-153; 69-2, ¶ 145).  Baez herself was substituted by Irmary Mercado ("Mercado"), who began working at Cooperativa at the end of July 2007.  She was under 30 years old and was not pregnant when hired. (Docket No. 58-2, ¶ 155).  Colón testified that she did not know exactly who substituted for Baez. She testified that none of the women who could have substituted for Baez was pregnant and none was more than 40 years old.  (Docket No. 58-2, ¶¶ 160-61).

**H.     Cooperativa's Disciplinary Practices**

A Cooperativa employee's disciplinary process is initiated by the employee's direct supervisor, who takes the employee's evaluation and the employee's file, which contains a record of all the incidents of errors or non-compliance by the employee, to the Vice-President of Operations (here, Matías).  Cooperativa management then investigates and decides what disciplinary action to take with the employee after consulting with its labor counsel.  López never initiates the process. Once the decision to terminate an employee is made, Matías is the person who gives the employee his or her termination letter and discusses the termination with the employee.  Matías does not fire

---

[3] In or around November or December 2008, Cooperativa provided Ramos with her 2008 yearly evaluation, during which time López was still Executive President.  Ramos incorrectly stated in an affidavit that she received a general rating of "poor" on the evaluation, when in fact she received an "average" rating.  She was not fired as a result of that evaluation.  (Docket Nos. 58-20, ¶¶ 1-4; 66, ¶¶ 179, 180, 184).

employees, but only makes recommendations on the matter. (Docket Nos. 35-28, ¶ 71; 46-24, p. 3-5; 58-2, ¶¶ 129, 132). Puerto Rico law, 7 L.P.R.A. § 1365j, gives a cooperative's executive president hiring and firing powers. López, as Cooperativa's Executive President, is the person responsible for terminating Cooperativa personnel from employment. He makes the final decision regarding whether or not to terminate an employee at Cooperativa, which does not have a formalized human resources department. He testified that it was he who made the final decision to terminate Baez from employment. Baez was never suspended during the ten years she worked for Cooperativa. (Docket Nos. 35-28, ¶¶ 77-79; 58-2, ¶¶ 5, 6, 53, 54, 130-31, 137).

The Manual states that an employee who receives a grade of "poor" on the annual evaluation will begin a three-month probationary period at Cooperativa and will be informed of improvement alternatives and the consequences of not showing significant improvement during that period. Baez was not given the probationary period before her termination, and her supervisor, Colón, did not know why, since termination decisions are made by Cooperativa's administration. However, the Manual also states that there are actions an employee can take that can entail suspension or termination if previous corrective measures have not been effective or if the severity of the event deserves it. Among these events is the failure "to comply with the procedures of inactive account [sic] and the protection and management of transactions and custody of cash and values and norms of institutional security." Matías testified that Baez was terminated for just such a violation, and that Baez's termination letter included the "concept" of that section of the Manual although it did not cite the Manual specifically. Matías testified that Cooperativa had not invoked that section of the Manual to terminate Baez earlier in 2007 when she committed the register error because Cooperativa had decided to give Baez an opportunity. However, Matías testified, by the time of Baez's evaluation, Cooperativa looked at Baez's increased losses, totaling $700, and concluded the situation could not continue, hence the decision to terminate Baez. Matías testified that the Manual is a guide, not a contract. (Docket Nos. 58-2, ¶¶ 163-67; 69-2, ¶¶ 163-67; 80-7, p. 27-32). (Docket No. 58-2, ¶ 166).

## I.     Cooperativa's Alleged Treatment of Baez and Other Pregnant Employees

Baez and several of her coworkers have stated that during both of Baez's pregnancies, López repeatedly made comments to Baez about her being pregnant at her age.  According to Baez, López would frequently comment that "any child [Baez] may give birth to would call [Baez] grandmother instead of mother." (Docket Nos. 58-2, ¶ 14; 76-16, p. 20).  Colón testified that on one occasion Baez told her López had made a comment that Baez was going to be a grandmother, but Colón did not know in what context the comment was made.  According to Colón, Baez never complained to her during either of her pregnancies that she was being discriminated against by López.  Colón testified that she did not hear López make such comments to Baez, has not heard about such comments from any other employees, and has never observed discriminatory conduct at Cooperativa toward pregnant employees.  (Docket No. 35-28, ¶¶ 36, 43; 58-2, ¶ 122; 69-2, ¶¶ 105, 122).  Colón testified that Cooperativa hired a teller who was pregnant, but could not recall if that occurred during Baez's term of employment.  According to Colón, López did not get involved in the interviews of potential employees.  (Docket No. 35-28, ¶¶ 38-39).  Matías, like Colón, testified that she had not heard López make any remarks to Baez about her pregnancy or age.  (Docket No. 69-2, ¶ 105).

Delgado testified that López made fun of Baez's age before Baez became pregnant, and then, once she was pregnant, he would  make mocking comments about Baez to her face, in front of other employees.  According to Delgado, López's comments included multiple variations on the theme about whether Baez would be a mother or a grandmother, the remark that "[w]hen you are vomiting it will not be known whether it is because you are pregnant or due to menopause," and negative commentary about Baez's appearance while pregnant.  Baez appeared to Delgado to be calm and patient in response to the comments, whose dates Delgado could not remember, though she testified she learned of at least one such comment per day.  Delgado testified that López did not mock any other workers.  According to Delgado, López once told her there was an "epidemic" of pregnancy at Cooperativa and asked Delgado whether she was "operated" (*i.e.*, had had a tubal ligation).

Delgado testified that she did not report López's comments because she felt that the supervisor

would not do anything about it, and that despite the frequency of López's comments, nobody, including Matías, ever told him to stop.  (Docket Nos. 35-28, ¶¶ 56-59, 62; 58-2, ¶¶ 101-106, 108, 111-14).  According to Delgado, during Baez's first pregnancy, two other, younger Cooperativa employees, neither of whom was a teller, were also pregnant.  Delgado testified that those employees received passes to use the building's elevator in lieu of the stairs, but Baez did not receive such a card. Delgado testified that she did not witness any discriminatory conduct towards the other pregnant employees, but she also testified that the two other pregnant employees were transferred to other roles while pregnant due, she thought, to their pregnancies.  (Docket Nos. 35-28, ¶ 61; 58-2, ¶ 162).

Pagán testified that she observed that López treated Baez differently after Baez became pregnant.  (Docket No. 46-20, p. 7).  Pagán testified that during Baez's first pregnancy, López would come to the tellers' area to make jokes, make fun of people, and make offensive comments intended in jest.  Pagán testified that she overheard López jokingly comment to Baez that Baez was too old to have children and ask whether the child's schoolmates would call Baez "mother" or "grandmother." Pagán did not recall Baez's responses to the comments.  She testified that she had also heard from someone else about López's making a similar comment which she herself did not hear.  (Docket No. 35-28, ¶¶ 47, 52, 53, 54; 58-2, ¶¶ 115-16, 119; 69-2, ¶¶ 105, 115-16).

Baez testified that Colón and Pagán were both subjected to pregnancy-based discrimination. However, Colón testified that during her own pregnancy, before she became a supervisor, Colón received an accommodation at her teller station.  (Docket No. 35-28, ¶¶ 40, 85).  Likewise, Pagán testified that her experience at Cooperativa during her pregnancy was "normal": she was never humiliated and her job functions were not changed due to her pregnancy.  (Docket No. 35-28, ¶¶ 45, 46, 51).  Elizabeth Sánchez García ("Sánchez"), who was a teller at Cooperativa from 1996 until 1999, took a leave of absence from Cooperativa during her last three months of pregnancy and testified that she experienced no improper or discriminatory conduct at work during her pregnancy. (Docket No. 35-28, ¶¶ 64, 67-68).  Former teller Norma Vazquez, who stated that she worked at Cooperativa between 1994 and 1996, stated in an affidavit that when López learned she was pregnant,

he asked her to resign, but she refused.  (Docket No. 58-2, ¶ 177; 58-17, ¶¶ 1, 10-13).

**J.      Procedural History**

In December 2007, Baez filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against López in his personal and official capacities.  The EEOC issued Baez a right-to-sue letter in June 2008.  (Docket No. 58-2, ¶¶ 55-56).  During the EEOC grievance process, Cooperativa and López filed a response to Baez's charge.  López stated in an affidavit to the EEOC that Baez was terminated due to her poor performance and Cooperativa's need to make adjustments in order to ensure regulatory compliance and to maintain its competitiveness, which entailed reducing its workforce and its operating costs.  These adjustments, according to López's affidavit, included terminating Baez, whose performance had caused Cooperativa economic losses.  (Docket Nos. 58-2, ¶¶ 57-58; 69-2, ¶ 58).

Plaintiffs filed the instant complaint on September 15, 2008, alleging the following causes of action: pregnancy discrimination in violation of the Pregnancy Discrimination Act of Title VII, 42 U.S.C. § 2000e(k), and Law 69 of July 6, 1985, as amended, 29 L.P.R.A. § 1321 *et seq.* ("Law 69"); age discrimination pursuant to the ADEA and Law 100 of June 30, 1959, as amended, 29 L.P.R.A. § 146 *et seq.* ("Law 100"); unjustified dismissal in violation of Law 80 of May 30, 1976, as amended, 29 L.P.R.A. § 185a *et seq.* ("Law 80"); violation of Puerto Rico's Working Mothers Act, Law 3 of March 13, 1942, as amended, 29 L.P.R.A. § 467 *et seq.* ("Law 3"); and violation of Puerto Rico's general tort statutes, Articles 1802 and 1803 of the Civil Code, as amended, 31 L.P.R.A. §§ 5141-5142 ("Article 1802" and "Article 1803" respectively).  (Docket No. 1).  The court subsequently dismissed all claims against the López defendants, all claims by Ortiz, and all claims by the conjugal partnership Ortiz-Baez except the Article 1802 and 1803 claims.[4]  (Docket Nos. 31, 91).

---

[4] Ortiz moved to dismiss voluntarily his Article 1802 and 1803 claims as time-barred pursuant to the First Circuit's decision in <u>Gonzalez Figueroa v. J.C. Penney P.R., Inc.</u>, 568 F.3d 313 (1st Cir. 2009).  (Docket No. 88).  In <u>Gonzalez Figueroa</u>, an employment discrimination case, the court held that the plaintiff's relatives' derivative claims under Article 1802 accrued for purposes of the one-year statutory limitations period when the relatives learned of the plaintiff's demotion.  Consequently, because the

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material only if it "might affect the outcome of the suit under the governing law."  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson, 477 U.S. at 248-50).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Once this threshold is met, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" and support such facts with "affidavits . . . made on personal knowledge . . . set[ting] forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e).  While the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," Leary, 58 F.3d at 751, summary judgment is still appropriate where the nonmoving party rests entirely on conclusory allegations, improbable inferences, unsupported speculation, or wholesale denials with regard to any essential element of the claim. Fed. R. Civ. P. 56(e); Libertad v. Welch, 53 F.3d 428, 435 (1st Cir. 1995); Carroll v. Xerox Corp., 294 F.3d 231,

---

relatives' claims were not tolled, they were time-barred.  568 F.3d at 318-22.  In granting Ortiz's motion (Docket No. 91), the court did not dismiss the conjugal partnership Ortiz-Baez's Article 1802 and 1803 claims.  Because the conjugal partnership's claims are purely derivative of Baez's, see Jorge v. Rumsfeld, 404 F.3d 556, 558 n.1 (1st Cir. 2005), I recommend that in light of Gonzalez Figueroa, the court likewise **dismiss** as time-barred the Article 1802 and 1803 claims by the conjugal partnership.

236-37 (1st Cir. 2002); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## III. ANALYSIS

**A.      Objection to Plaintiffs' Amended Opposing Statement of Uncontested Material Facts**

        In support of their opposition to defendant's motion for summary judgment (Docket No. 58), plaintiffs filed an original statement of uncontested material facts ("POSUMF").  (Docket No. 58-2). The court then issued an order compelling certain discovery from defendant and allowing plaintiffs to supplement or amend their motion in opposition upon receipt of the discovery.  (Docket No. 61). In due course, plaintiffs filed a "supplemental" motion in opposition (which plaintiffs have clarified is intended to supersede, not supplement, the original motion) and a supplemental statement of uncontested material facts ("PSSUMF") (which is truly supplemental).  (Docket Nos. 66; 67; 84, p. 2).  In its reply to both plaintiff's original and supplemental motions, defendant correctly pointed out that neither the POSUMF nor the PSSUMF complied with Local Rule 56(c).  (Docket No. 69, p. 2-3). Plaintiffs filed a motion requesting leave to file a sur-reply (Docket No. 74), which the court granted. (Docket No. 77).   Plaintiff then filed the sur-reply (Docket No. 84), along with a fifty-five-page "amended" opposing statement of uncontested material facts ("PASUMF").   (Docket No. 83). Defendants object to the filing of the PASUMF and urge the court to disregard it.  (Docket No. 85).

        As defendant notes, the POSUMF does not properly admit, deny, or qualify the facts supporting defendant's summary judgment motion by reference to each numbered paragraph of defendant's statement of material facts, as required by Local Rule 56(c).  The POSUMF simply says that plaintiffs "stipulate" that certain of defendant's facts (listed by paragraph number) "are uncontested," that the rest of defendant's facts "[are] contested," and that plaintiffs are submitting the POSUMF in response.  (Docket No. 58-2).  The PSSUMF did nothing to cure this defect, but merely added eleven new facts.  (Docket No. 66).

        After defendant pointed out these deficiencies, plaintiffs submitted the PASUMF, which states that after reviewing defendant's statement of facts, plaintiffs "have modified their admissions slightly and proceeded to discuss the contested material facts in depth for purposes of facilitating the Court's

task of reviewing the parties' possessions.  Note that they have *only added* stipulate[d] facts and believe that they have not excluded any previously admitted statements."  (Docket No. 83, p. 2). Plaintiffs' attempt to downplay the import of the PASUMF is unavailing: the "slight modification" overhauls the POSUMF into a format that does comply with Local Rule 56(c), in contrast to the earlier filings.

The court will not indulge this belated attempt to comply with a rule that is well-known, frequently invoked, and scrupulously enforced in this district.  Plaintiffs were granted multiple extensions of time to file their original motion in opposition (see Docket Nos. 38, 42, 48, 51) and were also allowed to supplement or amend their original filings upon the production of the discovery they had sought to compel.  (Docket No. 61).  Plaintiffs thus had more than ample opportunity to file a statement of facts that complied with Local Rule 56, as it was their duty to do from the start. Moreover, plaintiffs' request for leave to file a sur-reply never mentioned to the court their intent to slip in the PASUMF along with the sur-reply.  (See Docket No. 74).  Accordingly, in determining the factual background recited *supra*, I have disregarded the PASUMF and have utilized only the POSUMF and PSSUMF.  See Local R. 56(e) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, *shall be deemed admitted unless properly controverted*.") (emphasis added).  Should this work to plaintiffs' detriment, plaintiffs could wholly and easily have avoided such result.  See, e.g., P.R. Am. Ins. Co. v. Rivera-Vasquez, 603 F.3d 125, 131 (1st Cir. 2010) (stating that parties who "ignore the strictures" of Local Rule 56 do so "at their peril" when they fail to follow the letter of the rule by clearly admitting, denying or qualifying in numerical order proposed uncontested facts).

**B.      Age Discrimination under the ADEA**

The ADEA makes it illegal for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges

of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[5]  As the Supreme Court

recently clarified, a plaintiff must "establish that age was the 'but-for' cause of the employer's adverse

action."  Gross v. FBL Fin. Servs., Inc., — U.S. —, 129 S.Ct. 2343, 2351 (2009) (cited in Vélez v.

Thermo King de P.R., Inc., 585 F.3d 441, 446 (1st Cir. 2009)).  Where an employee lacks direct

evidence that the employer's actions were motivated by age animus, the First Circuit applies the

burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991).[6]  Since plaintiff does not argue direct

evidence that Cooperativa's actions were motivated by discriminatory animus, the McDonnell

Douglas framework applies to the instant case.

In this framework, the first step involves the employee's *prima facie* case, which consists of

four factors.  The employee must show: (1) that she is over forty years of age; (2) that her job

performance was satisfactory and met the employer's legitimate expectations; (3) that she suffered

an adverse employment action; and (4) that the defendant "sought a replacement with roughly

equivalent job qualifications, thus revealing a continued need for the same services and skills."  See

Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 (1st Cir. 2002); Serrano-Cruz v. DFI P.R., Inc., 109 F.3d

23, 25 (1st Cir. 1997); Mesnick, 950 F.2d at 823.

---

[5] As defendant correctly points out, both the ADEA and Title VII require that a plaintiff exhaust
administrative remedies before filing suit.  Accordingly, Baez had to file her EEOC charge within 300
days of the last incident of alleged discrimination. 29 U.S.C. § 626(d)(1)(B) (ADEA); 42 U.S.C. §
2000e-5(e)(1) (Title VII); see generally Perez-Cordero v. Wal-Mart P.R., Inc., 235 F. Supp. 2d 95, 100
(D.P.R. 2002).  Because Baez's first pregnancy ended on May 17, 2006, but she did not file her EEOC
charge until December 7, 2007 (Docket No. 58-32), defendant contends that claims relating to the first
pregnancy are time-barred.  (Docket No. 35, p. 4-5).  Defendant misconstrues the statutes: it is the
unlawful practice that starts the clock running.  See Landrau-Romero v. Banco Popular de P.R., 212 F.3d
607, 611-12 (1st Cir. 2000).  Furthermore, since, as discussed *infra*, Baez alleges continuing violations of
Title VII and the ADEA on a hostile work environment theory, the court will not disregard unlawful acts
that pre-date the 300-day window for the purpose of analyzing the hostile environment claims.  See Nat'l
R. R. Passenger Corp. v. Morgan, 536 U.S. 101, 103 (2002).
[6] The First Circuit continues to use the McDonnell Douglas framework even after the Supreme
Court noted in Gross that it has not definitively decided whether McDonnell Douglas's evidentiary
framework, utilized in Title VII cases, is appropriate in the ADEA context.  Vélez, 585 F.3d at 447 n.2
(quoting Gross, — U.S. at —, 129 S.Ct. at 2349 n.2).

Defendant concedes that plaintiff was in the protected age group and that her termination was an adverse employment action, but argues that plaintiff cannot show that her job performance met Cooperativa's legitimate job expectations. (Docket No. 35, p. 13). To establish this <u>McDonnell Douglas</u> factor, the plaintiff must address two considerations: "whether the employer's expectations were legitimate and if so, whether the employee was meeting those expectations." <u>Meléndez v. Autogermana, Inc.</u>, 606 F. Supp. 2d 189, 196 (D.P.R. 2009), *aff'd*, ___ F.3d ___, 2010 WL 3958847 (1st Cir. Oct. 12, 2010) (citation and quotation omitted). The court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case. <u>Thermo King</u>, 585 F.3d at 448-49 (citations and quotation omitted). Therefore, at this point, the court disregards Cooperativa's given reason for terminating plaintiff – her poor score on her annual evaluation – and instead considers other evidence of plaintiff's performance.

To show that she was meeting Cooperativa's legitimate expectations when she was dismissed - and despite her admitted January 2007 register shortage - Baez has introduced testimony by her coworker Delgado that she was a good employee. While it is only the decisionmaker's perception of the employee that is relevant, not the employee's or her colleagues', *see* <u>Torrech-Hernandez v. Gen. Elec. Co.</u>, 519 F.3d 41, 49 (1st Cir. 2008) (internal citation omitted), Baez has introduced evidence of Cooperativa's perception of her as well. Matías, who holds a decisionmaking role, testified that Baez had a lot of experience as a teller and knew all of Cooperativa's procedures. Baez also points to wage increases for the years 2000, 2002, 2003, 2004, and 2005, and to the fact that she had never been suspended in her ten years at Cooperativa.

Baez's annual evaluations from 2004, 2005, and 2006 show that her overall performance dropped from good to average, that she consistently had problems satisfying Cooperativa's expectations in the area of productivity, and that she had poor attendance during the 2006 evaluation period. (Docket Nos. 76-10; 76-11; 76-12). However, the evaluations demonstrate that Cooperativa never considered her overall performance to be inadequate during those years. A plaintiff need "only show that [her] performance was of sufficient quality to merit continued employment," not that it was

perfect or even average.  Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir. 1978) (citation omitted).

Baez's burden at the *prima facie* stage is not especially onerous.  Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003).  I therefore find that Baez's evidence is sufficient to create a triable issue as to whether Baez was meeting Cooperativa's legitimate expectations.  See Woodman v. Haemonetics Corp., 51 F.3d 1087, 1092 (1st Cir. 1995), *cited in* Melendez, 2010 WL 3958847, at *4 (implicitly rejecting district court's refusal to consider employee's stellar historic performance record as evidence of continuing adequate performance at time of dismissal).

Baez must next satisfy the fourth prong of the *prima facie* case: that Cooperativa sought out a replacement for Baez who was roughly as qualified as Baez for the teller position, thus showing a continuing need for Baez's skills. Cooperativa hired Aponte as a teller within a week of firing Baez, after placing a want ad in the newspaper while Baez was on vacation.  Cooperativa also hired Mercado in July 2007 and Santiago in October 2007, both as tellers.  Plaintiff introduced no evidence of the qualifications or skills of any of the three new hires, though their ages (30, 24, and under 30, respectively) suggest they did not have experience commensurate with Baez's ten-year term at Cooperativa.  Cooperativa disputes the characterization of Aponte as Baez's "replacement," since Colón allegedly requested a full-time and a part-time employee to replace a teller who had resigned, but Cooperativa admits that Baez was "substituted by" Mercado.  On balance, I find that Baez has met the fourth prong and has established a *prima facie* case under the McDonnell Douglas framework.

At this point, the burden of production – not the burden of proof – shifts to the defendant to articulate a legitimate, nondiscriminatory reason for Baez's dismissal.  Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30-31 (1st Cir. 2007); Mesnick, 950 F.2d at 823.  An employer is free to terminate an employee for any nondiscriminatory reason, whatever the merits of its business decisions.  Webber v. Int'l Paper Co., 417 F.3d 229, 238 (1st Cir. 2005).  Here, defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's termination: despite being given an opportunity to improve after her January 2007 register shortage, Baez continued to cause losses to Cooperativa.  After

evaluating Baez's performance in May 2007, Cooperativa decided it could no longer let the situation continue and chose to fire her.

Since Cooperativa has satisfied its burden of production, the burden shifts back to plaintiff, who can no longer rest on the initial inference of discrimination, but must show that defendant's articulated reason was pretextual. Bennett, 507 F.3d at 31; Mesnick, 950 F.2d at 823. At this point, the court focuses on the ultimate issue: "whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age." Dávila v. Corporación de P.R. de la Difusión Pública, 498 F.3d 9, 16 (1st Cir. 2007). "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." Mesnick, 950 F.2d at 824 (internal citation and quotation omitted). "Evidence establishing a prima facie case, in combination with evidence of pretext, can be sufficient to defeat summary judgment if a rational factfinder could conclude that unlawful age discrimination was the actual, but-for cause of the discrimination." Thermo King, 585 F.3d at 452 (citations omitted).

Baez first argues that her dismissal was pretextual because Cooperativa did not follow its own established policy in the Manual with regard to the three-month post-evaluation probationary period for employee improvement. Her supervisor, Colón, could not explain why Baez was not granted that period before her termination. Such an inconsistency can suggest pretext. See Thermo King, 585 F.3d at 450. Cooperativa responds that the Manual also allows for immediate termination for errors such as Baez's January 2007 register shortage, yet Cooperativa did not terminate Baez at that time, instead giving her a chance to improve until her May evaluation made it clear that the situation was untenable. However, Baez has introduced evidence that Pagán, who is under age 40, and Ramos, whose age is not in evidence, both committed errors that cost Cooperativa substantial sums (around $500 and $2,000, respectively) in the months following Baez's own error, yet they were not terminated and did not receive poor evaluations. For Cooperativa to point to the Manual's immediate

termination provisions, when it has repeatedly failed to enforce them, "adds to the suspicion that the company's reliance on the policy may be pretextual."  Id.

A plaintiff may also show pretext by demonstrating, *inter alia*, that the employer articulated different and arguably inconsistent explanations at different times for dismissing an employee. Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000).  Cooperativa has always maintained that Baez's poor performance evaluation was the basis for her termination.  However, it has provided other rationales that have changed over time.  Cooperativa argues that Baez committed errors that made her eligible for immediate termination according to the Manual, but while Matías testified that Baez's termination letter contained "the concept" of the Manual's provisions, the letter does no such thing.[7]  (Docket No. 80-2).  Furthermore, in Cooperativa's response to Baez's EEOC charge, López stated in an affidavit that Baez was terminated for her poor performance and Cooperativa's need to implement a cost-reduction plan.  This plan, López stated, included a "reduction in force" that affected Baez and one other employee.  (Docket No. 58-36, ¶¶ 5, 6, 13). Neither the cost-reduction plan nor the reduction in force was mentioned in Baez's termination letter, and Cooperativa has not made a reduction-in-force argument in this litigation.  This evidence, viewed as a whole, can support an inference of pretext.  See Santiago-Ramos, 217 F.3d at 56 ("Another method of establishing pretext is to show that [a defendant's] nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action.") (citations omitted).

While Baez has shown evidence suggesting that Cooperativa's explanations for her discharge were pretext for some other reason, in order to defeat summary judgment, she requires evidence from

---

[7] The letter reads, in pertinent part,
We recently discussed with you the evaluation as a regular employee of our Cooperativa. In the same you obtained a result that places you in a "poor" classification of execution and performance.  This result reflects that you did not fulfill the institutional expectations nor the requirements of the position, wherefore we have no other alternative than to terminate your employment with this Institution, effective today, June 8, 2007.
(Docket No. 80-2).  This explanation plainly does not reference, even "conceptually," the Manual's rule about "the protection and management of transactions and custody of cash and values and norms of institutional security" that defendant says Baez was terminated for breaking.  (See Docket No. 58-2, ¶ 7).

which a jury could reasonably find that age discrimination was the true motivation for the firing. Thermo King, 585 F.3d at 450. Here, Baez argues that the constant age-related comments by López during her pregnancies show that her termination was motivated by age animus. A plaintiff can demonstrate pretense by showing "that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) (internal citation omitted). López admittedly held the ultimate responsibility for terminating Baez. He testified that he did so based on her performance evaluation, with which he agreed. There is no evidence that he was involved in preparing the evaluation, whether directly or indirectly through Matías. Regardless, given his position as the top executive of Cooperativa, which includes hiring and firing power and the duty of signing off on employees' performance evaluations, it is reasonable to conclude that López was in a position to influence Matías's – and Colón's – decisionmaking. Accordingly, a reasonable jury could infer, based on López's comments about Baez's age, that age animus played a role in the decision to terminate Baez's employment. Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 676 (1st Cir. 1996).

Moreover, plaintiff has provided evidence of disparate treatment suggesting that age animus was the but-for cause for her termination. An employer's disparate treatment of employees in response to legitimately offensive behavior can be probative of discriminatory animus so long as the plaintiff shows that "the proposed analogue is similarly situated in material respects." Thermo King, 585 F.3d at 451 (internal citation and quotation omitted). The court examines "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Id. (citation and quotation omitted).

Baez has introduced evidence that Cooperativa gave a poor evaluation to Baez and then terminated her because of her $700 in register discrepancies, but did not do the same for Pagán or Ramos despite their arguably similar errors. Pagán is younger than Baez and under age 40; like Baez, she is a teller with ten years' experience who was under Colón, Matías, and López in Cooperativa's

Baez-Viera, *et al.* v. Cooperativa Abraham Rosa, *et al.*                                                    Page 25
Civil No. 08-2045 (JAG/BJM)
**REPORT AND RECOMMENDATION**

organizational hierarchy and who committed an error in 2007 that caused a significant monetary loss to Cooperativa.  (See Docket No. 69, p. 16).  In these respects, Baez and Pagán are similarly situated.[8]

Cooperativa argues that Baez was not subject to disparate treatment because, in keeping with policy, Pagán allegedly received a written warning for her error.  Cooperativa also argues that Pagán is not similarly situated to Baez because Pagán had not received a written warning before, whereas when Baez committed the January 2007 error, she allegedly had already received sixteen written warnings in her time at Cooperativa, including a warning in February 2005 for a $500 register shortage that threatened termination for a subsequent error.  Thus, Cooperativa contends, Baez was not in a similar disciplinary situation to Pagán when she was terminated.  (Id., p. 11, 16-18).

As Baez points out (Docket No. 84, p. 10), Cooperativa has not cited to record evidence of Pagán's written warning or disciplinary record or Baez's sixteen written warnings, including the alleged February 2005 warning.  Absent competent evidence, Cooperativa cannot overcome Baez's evidence that the younger Pagán was similarly situated to Baez but was treated differently.  Based on Baez's evidence, a reasonable jury could find that "disparate treatment existed, exposing the pretextual nature of [defendant's] proffered explanation for firing [Baez] and revealing that [defendant's] true motivation was age discrimination."  Thermo King, 585 F.3d at 450-51.  Taken together with the *prima facie* case, the foregoing evidence could "support a factfinder's conclusion that [defendant] was motivated by age-based discrimination, . . . thus rais[ing] a genuine issue of material fact that defeats summary judgment."  Id. at 449.  Accordingly, I recommend that the court **deny** Cooperativa's motion to dismiss Baez's disparate treatment-based age discrimination claim.

Less successful, however, is Baez's attempt to make out a hostile work environment claim.  (See Docket No. 1, ¶¶ 58, 66).  To establish a *prima facie* case under such a theory, a plaintiff must prove (1) that she is a member of a protected class; (2) that she was subjected to unwelcome

___

[8] While there is evidence that the two younger employees who were pregnant at the same time as Baez were treated differently than she was, it is undisputed that these employees were not tellers, so they were not similarly situated to Baez.  See Thermo King, 585 F.3d at 451.

harassment (3) based on age (4) that was sufficiently severe or pervasive so as to alter the conditions

of plaintiff's employment and create an abusive work environment and (5) that was both objectively

and subjectively offensive, such that a reasonable person would find it hostile or abusive and the

victim in fact did perceive it to be so; and (6) that some basis for employer liability has been

established.  Douglas v. J. C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir. 2007) (citing O'Rourke v.

City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)).  In evaluating the crucial fourth and fifth

elements of a hostile work environment case, courts typically consider "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance."

O'Rourke, 235 F.3d at 728-29 (citations and quotation omitted).

Cooperativa does not dispute its liability nor that Baez was over 40 and was subjected to

unwelcome age-based harassment, but argues that Baez cannot establish the fifth prong because

López's comments were made in jest.  (Docket No. 35, p. 11).  López's joking comments were not

severe, humiliating, or threatening; they were merely offensive utterances.[9]  Furthermore, there is no

evidence that the comments interfered with Baez's work performance or that they altered the

conditions of her job.  The evidence shows that while at least one of her coworkers found the

comments offensive, Baez herself stayed calm and patient in the face of the comments, never filed

a complaint about them, and mentioned them once at most to any of her coworkers (namely, Colón),

all of which suggests that she did not in fact find the comments offensive.  In short, López's age-

related comments were frequent and pervasive, but that is all that may be said of them.  Impolite

though they may have been, "the hostile work environment standard must be kept sufficiently

demanding to ensure that Title VII does not become a general civility code." Id. at 729 (citations and

---

[9] While "a broad range of conduct . . . can contribute to the creation of a hostile work
environment," id. at 729, Baez's allegation that unlike younger pregnant employees, she did not receive
an elevator card during her first pregnancy, adds little or nothing to her case.  There is no evidence that
she asked for her own card, and the mere failure to give her one can hardly be characterized as harassing.
(See Docket No. 76-3, p. 43-44).

quotations omitted).  Because Baez has not established the fourth or fifth elements of the *prima facie* case, I recommend that Baez not be allowed to proceed with her age discrimination claim on a hostile work environment theory.

Finally, Baez also fails to make out a *prima facie* claim of retaliation under the ADEA.  (See Docket No. 1, ¶¶ 42, 46).  The ADEA prohibits discrimination against an employee for having "opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).  The *prima facie* case requires an employee to show that she engaged in a protected activity and that she suffered an adverse employment action as a result of her participation in that activity.  Bennett v. Saint-Gobain Corp., 507 F.3d 23 (1st Cir. 2007) (citation omitted).  "At a bare minimum, this requires an employee to make a colorable showing of a causal connection between his protected activity . . . and the adverse employment action."  Id.

Baez has not shown that she engaged in any activity protected by the ADEA prior to her termination.  She did not file the EEOC charge until after she was fired and never made any internal complaint regarding López's conduct.  At most, the evidence shows that Baez once told Colón that López had made an age-related comment.  Even construing this incident liberally as ADA-protected conduct, Baez has not shown a causal connection to her termination.  Colón's draft evaluation did not score Baez as "poor," and there is no evidence that either Matías, who allegedly had Colón change the draft, or López, who ultimately terminated Baez, knew that Baez had told Colón about López's comment.  Benoit, 331 F.3d at 177 (no causal connection shown where supervisor who fired employee was unaware of employee's complaints).  Moreover, while temporal proximity between the protected conduct and the adverse action can support an inference that the former caused the latter, Bennett, 507 F.3d at 32, there is no evidence of when Baez informed Colón about the comment in relation to when Baez was terminated.  (See Docket No. 76-15, p. 19-21).  Accordingly, I recommend that the court **grant** summary judgment for defendant on Baez's ADEA retaliation claim.

## C.        Pregnancy Discrimination under Title VII

Title VII prohibits an employer from discharging or otherwise discriminating against any individual on the basis of "race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978 ("PDA") amended Title VII to protect "pregnancy, childbirth, and related medical conditions" from sex discrimination.  42 U.S.C. § 2000e(k); Gonzalez v. Biovail Corp. Int'l, 356 F. Supp. 2d 68, 78 (D.P.R. 2005) (citing Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1312 (11th Cir. 1994)).

Under Title VII, as under the ADEA, courts apply the McDonnell Douglas burden-shifting framework in cases where there is no direct evidence of discrimination.  The four-part *prima facie* case is as outlined above, except that to prove membership in a protected class under the first prong, a pregnancy discrimination plaintiff must show that she was pregnant or had indicated an intention to become pregnant.  Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 421 (1st Cir. 1996).  Where the employee is not pregnant or on maternity leave at or around the time of the alleged adverse employment action, to make the *prima facie* showing, the "plaintiff must do more than show she was, past tense, pregnant"; she must produce sufficient evidence to show that she was "'affected by pregnancy, childbirth or related medical conditions' *at the time of the adverse employment action*." Gonzalez, 356 F. Supp. 2d at 79 (citation and quotation omitted) (emphasis in original).

Here, defendant concedes that Baez, who was terminated about three weeks after her May 2007 miscarriage and maternity leave, meets the first prong of the *prima facie* case.  (Docket No. 35, p. 9).  Defendant maintains, however, that Baez cannot establish the second element, satisfactory job performance.  As discussed above, Baez has made a sufficient showing for this prong, as well as the third (adverse employment action) and the fourth (replacements, who were not pregnant, were brought in to fill continuing need for plaintiff's skills).  Accordingly, Baez has made out the *prima facie* case of sex discrimination based on pregnancy.

Cooperativa has given the same legitimate, nondiscriminatory reason for terminating Baez as above: her poor performance evaluation based on $700 in register discrepancies.  (Docket No. 35, p.

9-10).  The burden thus shifts back to Baez to show that the proffered reason is pretextual and that her pregnancy status was the true reason for her termination. Cooperativa's shifting rationale for the termination, its reliance on a Manual policy it did not actually follow, and its unexplained failure to provide Baez with the three-month probation period are evidence of pretext in the instant PDA context as in the ADEA context.

It remains, then, for Baez to show that the true cause of her termination was pregnancy discrimination.  Baez has provided evidence that López made repeated comments about Baez's pregnancy, was in a position to influence Matías's and Colón's handling of the evaluation that he reviewed and signed, and was the one to terminate Baez.  The evidence of disparate treatment of Pagán is relevant in the PDA context as in the ADEA context; so is the evidence pertaining to Ramos's treatment, since her unknown age is irrelevant here.  There is no suggestion that Pagán and Ramos were pregnant when they committed their respective errors, were reprimanded, or received their evaluations for the relevant years.[10]  Moreover, former teller Vázquez stated in an affidavit that López asked her to resign upon learning of her pregnancy.[11]  On the other hand, there is evidence from Colón, Pagán, and former teller Sánchez that they were not subjected to discriminatory treatment during their pregnancies, despite Baez's allegations to the contrary with regard to the first two women.  While Baez's termination came soon after her negative evaluation, its timing could also lead a reasonable jury to infer pregnancy-related animus as its true motivation, coming as it did so soon after her miscarriage, maternity leave, and expression of intent to become pregnant again.

Altogether, the evidence, though mixed, combined with the *prima facie* case, could allow a rational factfinder to conclude that pregnancy discrimination was the but-for cause of Baez's termination.  Thermo King, 585 F.3d at 452.  Accordingly, I recommend that the court **deny** summary

---

[10] The court does not consider the alleged disparate treatment of the two other pregnant Cooperativa employees because, as noted, they were not similarly situated to Baez.

[11] While Cooperativa attempts to discredit Vázquez's statement (Docket No. 69, p. 20-21), the court does not make credibility determinations at the summary judgment stage.  Anderson, 477 U.S. at 255; Mulero-Rodriguez, 98 F.3d at 678.

judgment on Baez's Title VII claim based on disparate treatment.  However, for the same reasons discussed above, Baez should not be allowed to proceed on a hostile work environment theory.

Finally, Baez has sufficiently alleged a *prima facie* retaliation claim under Title VII, which employs the same retaliation framework as the ADEA.  Taking maternity leave is protected conduct under the PDA "since a short-term inability to work is bound up with the very nature of pregnancy and childbirth."  F.W. Morse & Co., 76 F.3d at 424.  Here, Baez was terminated three weeks after returning from the two days' maternity leave she took following her miscarriage.  Temporal proximity alone can suffice to establish the *prima facie* retaliation case, so Baez has shown a causal connection between her maternity leave and her termination.  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004) (one month).  However, "pregnancy does not confer total immunity," so an employer may discharge an employee who is pregnant or on pregnancy-induced leave "so long as it does so for legitimate reasons unrelated to her gravidity."  F.W. Morse & Co., 76 F.3d at 424.  While Cooperativa has given a legitimate reason for terminating her, Baez has shown that a material fact issue exists regarding whether that reason was in fact pretext for retaliation.  Accordingly, I recommend that the court **deny** summary judgment on Baez's retaliation claim under Title VII.

**D.     State Law Claims**

In addition to her ADEA and Title VII claims, plaintiff also brings related state-law causes of action pursuant to this court's supplemental jurisdiction.  See 28 U.S.C. § 1367.  Baez alleges unjustified dismissal under Law 80, sex discrimination under Law 69, age and sex discrimination under Law 100, and violation of Law 3's protections for working mothers.  (Docket No. 1, p. 13-15).

Defendant contends that Baez cannot bring claims under Laws 3 and 69 because she was not pregnant when she was terminated.  Cooperativa argues that Law 69 is inapplicable because it proscribes employment discrimination "because of pregnancy, childbirth or related medical conditions."  (Docket No. 35, p. 17).  However, courts analyze Law 69 discrimination claims like Title VII discrimination claims.  Therefore, because material fact issues preclude summary judgment on Baez's Title VII claim, summary judgment on the Law 69 claim is also inappropriate.  Pagan-

Alejandro v. PR ACDelco Serv. Ctr., Inc., 468 F. Supp. 2d 316, 328 (D.P.R. 2006) (citing Mejias

Miranda v. BBII Acquisition Corp., 120 F. Supp. 2d 157, 174 (D.P.R. 2000)).  Furthermore, having

admitted that Baez falls within the class of persons protected by the PDA provisions of Title VII,

Cooperativa cannot at the same time deny that Law 69, which uses the same "pregnancy, childbirth

or related medical conditions" language as the PDA, is likewise applicable.  See 42 U.S.C. §

2000e(k).  Accordingly, I recommend that summary judgment be **denied** as to Baez's Law 69 claim

        While Law 3 claims, like Law 69 claims, are analyzed under the Title VII framework, id.,

Cooperativa argues that pregnancy is an essential requirement for the application of Law 3.  See Soc.

de Gananciales v. Centro Gráfico, 144 D.P.R. 952, 961 (1998).  Plaintiffs respond that miscarriages

constitute a "medical condition" within the meaning of Laws 3 and 69.  (Docket No. 67, p. 24).

However, the language protecting "pregnancy, childbirth or related medical conditions" occurs only

in Law 69, not in Law 3.  Compare 29 L.P.R.A § 1322(5) (Law 69) with 29 L.P.R.A. § 469 (Law 3).

Plaintiffs cite no authority to support their argument with regard to Law 3.  It is undisputed that Baez

was terminated three weeks after returning from maternity leave.  Accordingly, under the McDonnell

Douglas framework, Baez cannot meet the first *prima facie* prong of membership in the class

protected by the law.  Cf. Luciano Ramirez v. X-Perts, Inc., — T.C.A. —, 2008 WL 4610210, at *10

(P.R. Cir. Aug. 22, 2008) (Law 3 protects women who are pregnant, on maternity leave, or enjoying

temporary disability benefits).  Moreover, while Law 3 protects pregnant women from termination

due to a pregnancy-related drop in productivity, 29 L.P.R.A. § 469, Cooperativa has never given

Baez's pregnancy-related absences as a reason for her termination, nor have plaintiffs ever attributed

her errors at work to her pregnancy.  Accordingly, I recommend that the court **grant** summary

judgment to Cooperativa on Baez's Law 3 claim.

        Next, defendant asks for summary judgment on Baez's Laws 80 and 100 claims.  Law 100

prohibits dismissal for reason of age or sex, while Law 80 provides a compensation remedy for

employees dismissed without just cause.  Thermo King, 585 F.3d at 452 n.7 (citations omitted).  Law

100's "rather undemanding requirement" for establishing a *prima facie* case is that a plaintiff (1)

demonstrate that he was actually or constructively discharged, and (2) allege that the decision was discriminatory.  Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007) (internal citation and quotation omitted).  The burden of persuasion then shifts to the employer to show, by a preponderance of the evidence, that it had "good cause" for its action.  At that point, the burden of persuasion returns to the employee to show that the employer's decision was motivated by age discrimination instead of or in addition to the legitimate reasons for the termination.  Id.; Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998).  "Ultimately, under Law 100, if the employer can establish good cause, the employee is faced with the same burden of persuasion as an employee bringing suit under the ADEA [or Title VII]."  Velazquez-Fernandez, 476 F.3d at 11 (citation omitted); Alvarez-Fonseca, 152 F.3d at 28.

Baez has met her *prima facie* case by alleging that her actual termination was discriminatory.  To meet its burden, in turn, Cooperativa argues that Baez's register errors gave "good cause" for her dismissal.  (Docket No. 35, p. 15-16).  Baez's termination letter and the consistent testimony of her superiors that she was terminated for her errors, as reflected by her evaluation, provide ample evidence to support this argument.  Accordingly, the burden shifts back to Baez.  Because, as discussed above, Baez has shown material fact issues sufficient to preclude summary judgment on the ADEA and Title VII claims, summary judgment should likewise be **denied** as to Baez's Law 100 claim.  Velazquez-Fernandez, 476 F.3d at 11.

Under Law 80, which prohibits unjustified dismissal, a plaintiff must prove that she has been discharged and must allege that the discharge was unjustified, which Baez has done here.  The burden then shifts to the employer to show by a preponderance of the evidence that it had "just cause" for the dismissal.  Gonzalez v. El Dia, Inc., 304 F.3d 63, 75 (1st Cir. 2002) (citation omitted); Hoyos v. Telecorp Commc'ns, Inc., 488 F.3d 1, 6 (1st Cir. 2007) (citation omitted).  An employer will not be liable under Law 80 if it terminates an employee for a reason that constitutes just cause under the statute.  Otero-Burgos v. Inter Am. Univ., 558 F.3d 1, 7-8 (1st Cir. 2009). Law 80 provides numerous

reasons that constitute just cause, including performing work inefficiently, belatedly, negligently, or in violation of established quality standards.  29 L.P.R.A. § 185b(b).

Here, Cooperativa argues that Baez's register errors gave just cause for her dismissal.  (Docket No. 35, p. 16-17).  It is undisputed that Baez's register shortages in 2007 amounted to around $700, starting with an error of over $600.  However, as above, there is an issue of fact as to whether Cooperativa's stated reason for Baez's dismissal was pretextual, so summary judgment on the Law 80 claim should be **denied**.  Colon v. San Juan Marriott Resort and Stellaris Casino, 600 F. Supp. 2d 295, 317 (D.P.R. 2008) (García-Gregory, J.); Guillermety Mendez v. P.R. Cement Co., Inc., 56 F. Supp. 2d 176, 184 (D.P.R. 1999) (denying summary judgment on Law 80 claim where plaintiff raised triable fact issue as to whether alleged reasons for termination were actually a sham).  See also Cardalda-Sanchez v. Universidad Carlos Albizu, 2010 WL 597429, at *12 (D.P.R. Feb. 16, 2010) (material fact issue of whether nonrenewal of plaintiff's employment contract was for good cause under Law 100 likewise precluded summary judgment on Law 80 claim).

## IV. CONCLUSION

For the reasons stated above, I recommend that defendant's motion for summary judgment be **granted in part and denied in part**, namely, that the court **grant** summary judgment for Cooperativa on plaintiffs' Law 3 claim, Title VII hostile work environment claim, and claims for retaliation and hostile work environment under the ADEA, and **deny** summary judgment as to all other claims.

The parties have fourteen days to file any objections to this report and recommendation.  See Local Rule 72(d); 28 U.S.C. § 636(b)(1).  Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4, 6 (1st Cir. 1986); see also Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988).

**Baez-Viera, *et al.* v. Cooperativa Abraham Rosa, *et al.***                                        Page 34
Civil No. 08-2045 (JAG/BJM)
**REPORT AND RECOMMENDATION**

## IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 9th day of November, 2010.


                                    **S/Bruce J. McGiverin**
                                    BRUCE J. McGIVERIN
                                    United States Magistrate Judge